**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE PADILLA and ESTELA LEBRON,
  *Plaintiffs-Appellees,*

  v.

JOHN YOO,

  *Defendant-Appellant.*

No. 09-16478

D.C. No.
3:08-cv-00035-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
June 14, 2010—San Francisco, California
Submission vacated October 18, 2010
Resubmitted December 8, 2011

Filed May 2, 2012

Before: Raymond C. Fisher and N. Randy Smith,
Circuit Judges, and Rebecca R. Pallmeyer,
District Judge.*˙**

Opinion by Judge Fisher

---

*The Honorable Rebecca R. Pallmeyer, United States District Judge for the Northern District of Illinois, sitting by designation.

**Judge Smith was drawn to replace Judge Pamela A. Rymer on the panel following Judge Rymer's untimely death. Judge Smith has read the briefs, reviewed the record and listened to the tape of oral argument.

4505

## COUNSEL

Miguel A. Estrada (argued) and Scott P. Martin, Gibson, Dunn & Crutcher LLP, Washington, D.C., for the appellant.

Jonathan M. Freiman (argued), Hope R. Metcalf, Tahlia Townsend and Amos E. Friedland, New Haven, Connecticut; Natalie L. Bridgeman, San Francisco, California, for the appellees.

Paul J. Orfanedes, Washington, D.C., for amicus curiae Judicial Watch, Inc.

Michael F. Hertz, Deputy Assistant Attorney General, Barbara L. Herwig and Robert M. Loeb, U.S. Department of Justice, Washington, D.C., for amicus curiae United States.

Peter B. Ellis and Usha-Kiran K. Ghia, Foley Hoag LLP, Boston, Massachusetts, for amici curiae Bruce Fein, Roberts B. Owen and Michael P. Scharf.

Eric L. Lewis, Baach Robinson & Lewis PLLC, Washington, D.C.; Elizabeth A. Wilson, John C. Whitehead School of Diplomacy and International Relations, Seton Hall University, South Orange, New Jersey, for amici curiae Distinguished Professors of Constitutional and Federal Courts Law.

Hamid Jabbar, Scottsdale, Arizona; Hirad D. Dadgostar, Los Angeles, California; Dawinder S. Sidhu, Potomac, Maryland, for amici curiae Legal Ethics Scholars.

---

## OPINION

FISHER, Circuit Judge:

After the September 11, 2001 attacks on the United States, the government detained Jose Padilla, an American citizen, as

an enemy combatant. Padilla alleges that he was held incommunicado in military detention, subjected to coercive interrogation techniques and detained under harsh conditions of confinement, all in violation of his constitutional and statutory rights. In this lawsuit, plaintiffs Padilla and his mother, Estela Lebron, seek to hold defendant John Yoo, who was the Deputy Assistant Attorney General in the U.S. Department of Justice's Office of Legal Counsel (OLC) from 2001 to 2003, liable for damages they allege they suffered from these unlawful actions. Under recent Supreme Court law, however, we are compelled to conclude that, regardless of the legality of Padilla's detention and the wisdom of Yoo's judgments, at the time he acted the law was not "sufficiently clear that every reasonable official would have understood that what he [wa]s doing violate[d]" the plaintiffs' rights. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted). We therefore hold that Yoo must be granted qualified immunity, and accordingly reverse the decision of the district court.

As we explain below, we reach this conclusion for two reasons. First, although during Yoo's tenure at OLC the constitutional rights of convicted prisoners and persons subject to ordinary criminal process were, in many respects, clearly established, it was not "beyond debate" at that time that Padilla — who was not a convicted prisoner or criminal defendant, but a suspected terrorist designated an enemy combatant and confined to military detention by order of the President — was entitled to the same constitutional protections as an ordinary convicted prisoner or accused criminal. *Id.* Second, although it has been clearly established for decades that torture of an American citizen violates the Constitution, and we assume without deciding that Padilla's alleged treatment rose to the level of torture, that such treatment *was* torture was not clearly established in 2001-03.

## I.  BACKGROUND[1]

### A.

In early May 2002, Padilla was arrested at Chicago O'Hare International Airport pursuant to a material witness warrant issued by the United States District Court for the Southern District of New York. Compl. ¶ 35. He was transported to New York, where he was held in custody in a federal detention facility. *Id.*

On June 9, 2002, President George W. Bush issued an order declaring Padilla an "enemy combatant" and directing the Secretary of Defense to take Padilla into military custody. Compl. ¶ 40. The presidential order asserted that Padilla was "closely associated with al Qaeda"; that he had "engaged in conduct that constituted hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States"; that he "possesse[d] intelligence, including intelligence about personnel and activities of al Qaeda, that, if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda on the United States"; that he "represent[ed] a continuing, present and grave danger to the national security of the United States"; and that his detention was "necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens." Memorandum from President

---

[1]Because Yoo appeals from the district court's denial of a motion to dismiss, we recite the facts as they appear in the plaintiffs' first amended complaint. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("We accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party."). We emphasize that this factual background is based only on the *allegations* of the plaintiffs' complaint. Whether the plaintiffs' allegations are in fact true has not been decided in this litigation, and nothing we say in this opinion should be understood otherwise.

George W. Bush to the Secretary of Defense (June 9, 2002), *reprinted in Padilla v. Hanft*, 423 F.3d 386, 389 (4th Cir. 2005).**²**

In accordance with the President's order, Padilla was transferred from the federal detention facility in New York to a military brig in Charleston, South Carolina, where he was held in military custody for more than three and a half years, from June 2002 until January 2006. Compl. ¶¶ 1, 44. For a substantial portion of this period, from June 2002 until March 2004, government officials denied Padilla all contact with persons outside the brig, including his family and legal counsel. Compl. ¶ 56.

On January 5, 2006, Padilla was transferred from the military brig to a federal detention center in Miami, Florida, where he stood trial in federal district court on criminal charges unrelated to the allegations that had been used to justify his military detention. Compl. ¶ 11. In August 2007, the jury returned a verdict of guilty. *Id.* In September 2011, a divided Eleventh Circuit panel affirmed Padilla's conviction, vacated his sentence as unreasonably low and remanded for resentencing. *See United States v. Jayyousi*, 657 F.3d 1085, 1117-19 (11th Cir. 2011).

Padilla and his mother, Estela Lebron, filed this civil action against John Yoo, in his individual capacity, on January 4, 2008, two years after Padilla's military detention ended. In their first amended complaint, Padilla and Lebron alleged that Padilla was imprisoned in the military brig without charge and without the ability to defend himself or to challenge his conditions of confinement. Compl. ¶ 1. They alleged that during Padilla's detention, he suffered gross physical and psychological abuse upon the orders of high-ranking government officials as part of a systematic program of abusive interroga-

---

**²**The President's memorandum, which the plaintiffs attached to their complaint, is part of the record for purposes of Yoo's motion to dismiss. *See Daniels-Hall*, 629 F.3d at 998.

tion mirroring the alleged abuses committed at Guatanamo Bay, including extreme isolation; interrogation under threat of torture, deportation and even death; prolonged sleep adjustment and sensory deprivation; exposure to extreme temperatures and noxious odors; denial of access to necessary medical and psychiatric care; substantial interference with his ability to practice his religion; and incommunicado detention for almost two years, without access to family, counsel or the courts. *Id.* They also alleged that Lebron was deprived of virtually all contact with Padilla during his prolonged and allegedly unlawful military detention, in violation of her constitutional rights to familial association and communication. Compl. ¶ 2.

The complaint alleged that Yoo is one of several current and former government officials who abused their high positions to cause Padilla's allegedly unlawful military detention and interrogation. Compl. ¶ 3. From 2001 to 2003, Yoo was Deputy Assistant Attorney General at OLC. Compl. ¶ 13. Padilla and Lebron alleged that Yoo set in motion Padilla's allegedly illegal interrogation and detention, both by formulating unlawful policies for the designation, detention and interrogation of suspected "enemy combatants" and by issuing legal memoranda designed to evade legal restraints on those policies and to immunize those who implemented them. Compl. ¶ 3. They alleged that, in doing so, Yoo abdicated his ethical duties as a government attorney and abandoned his office's tradition of providing objective legal advice to the President. *Id.*

The complaint alleged that Yoo publicly acknowledged in his book, *War By Other Means*, that he stepped beyond his role as a lawyer to participate directly in developing policy in the war on terrorism. Compl. ¶ 15. It alleged that Yoo shaped government policy in his role as a key member of a small, secretive and highly influential group of senior administration officials known as the "War Council," which met regularly "to develop policy in the war on terrorism." *Id.* It alleged that

Yoo acted outside the scope of his employment at OLC by taking instructions directly from White House Counsel Alberto Gonzales and providing Gonzales with verbal and written advice without first consulting Attorney General John Ashcroft. Compl. ¶ 16. The complaint alleged that, in his role as the de facto head of war-on-terrorism legal issues, Yoo wrote and promulgated a series of memoranda that ultimately led to Padilla's allegedly unlawful treatment, including:

• An October 23, 2001 memorandum from Yoo to Gonzales and Department of Defense General Counsel William J. Haynes regarding *Authority for Use of Military Force to Combat Terrorist Activities Within the United States*, which concluded that "the Fourth Amendment had no application to domestic military operations," and that "restrictions outlined in the Fifth Amendment simply do not address actions the Executive takes in conducting a military campaign against the nation's enemies."

• A December 21, 2001 memorandum from Yoo to Haynes regarding *Possible Criminal Charges Against American Citizen Who Was a Member of the Al Qaeda Terrorist Organization or the Taliban Militia*.

• A January 9, 2002 draft memorandum from Yoo to Haynes on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees*.

• A January 22, 2002 memorandum to Gonzales signed by then-Assistant Attorney General Jay Bybee but allegedly drafted by Yoo on the *Application of Treaties and Laws to al Qaeda and Taliban Detainees*.

• A February 26, 2002 memorandum to Haynes signed by Bybee but allegedly created by Yoo on *Potential Legal Constraints Applicable to Interrogations of Persons Captured by U.S. Armed Forces in Afghanistan*.

• A May 2002 OLC memorandum regarding access to counsel and legal mail by detainees held at the naval brigs at Norfolk and Charleston.

• A June 27, 2002 memorandum from Yoo to Assistant Attorney General Daniel J. Bryant of the Office of Legislative Affairs regarding *The Applicability of 18 U.S.C. Sec. 4001(a) to Military Detention of United States Citizens*.

• An August 1, 2002 memorandum to Gonzales, again signed by Bybee but allegedly created by Yoo, on *Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340-2340A*, concluding that an interrogation technique must cause damage that rises "to the level of death, organ failure, or the permanent impairment of a significant body function" in order to be considered torture.

• A second memorandum produced during August 2002 addressing the legality of particular interrogation techniques that the CIA wished to employ.

• A November 27, 2002 memorandum from Haynes that Yoo allegedly reviewed and approved, recommending that Secretary of Defense Donald Rumsfeld approve for use by the military a range of aggressive interrogation techniques not permitted by the military field manual.

• A March 14, 2003 opinion from Yoo to Haynes on *Military Interrogation of Alien Unlawful Combatants Held Outside the United States*, extending authority to use harsh interrogation techniques against high-level prisoners held at Guantanamo Bay and other facilities under Department of Defense control, and approving the use of mind-altering drugs during interrogations. Compl. ¶¶ 19-20.

The complaint alleged that these memoranda advised that there were no legal constraints on the Executive's policies with respect to the detention and interrogation of suspected

terrorists. Compl. ¶ 21. It alleged that the memoranda "did not provide the fair and impartial evaluation of the law required by OLC tradition and the ethical obligations of an attorney to provide the client with an exposition of the law adequate to make an informed decision." Compl. ¶ 22. Rather, it alleged that Yoo "intentionally used the Memos to evade well-established legal constraints and to justify illegal policy choices that he knew had already been made — sometimes by virtue of his own participation in the War Council." Compl. ¶ 23.

The complaint also alleged that Yoo personally participated in Padilla's unlawful military detention. Quoting from Yoo's book, it alleged that Yoo "personally 'reviewed the material on Padilla to determine whether he could qualify, legally, as an enemy combatant, and issued an opinion to that effect.' " Compl. ¶ 38. It alleged that Ashcroft relied on Yoo's opinion in recommending to the President that Padilla be taken into military custody. Comp. ¶ 39.

The complaint alleged that Padilla's designation as an enemy combatant, military detention, conditions of confinement and program of interrogation violated his rights to procedural and substantive due process, not to be subjected to cruel or unusual punishment or treatment that shocks the conscience, to freely exercise his religion, of access to information, to association with family members and friends, of access to legal counsel, of access to the courts, against compelled self-incrimination and against arbitrary and unconstitutional seizure and military detention. Compl. ¶ 5. It alleged violations of the First, Fourth, Fifth, Sixth and Eighth Amendments to the United States Constitution, Article III of the Constitution, the Habeas Suspension and Treason Clauses of the Constitution and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb. Compl. ¶ 82.

The complaint sought two remedies: a declaration that Padilla's treatment violated the Constitution and RFRA, and

nominal money damages of one dollar. The plaintiffs subsequently agreed to dismiss their claims for declaratory relief, leaving only a claim for nominal damages.

**B.**

Yoo moved to dismiss the action for failure to state a claim upon which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6). He argued that the complaint failed to state a claim for money damages on three grounds. First, he argued that the plaintiffs could not state an action for damages because *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which recognized an implied cause of action for damages against federal officials under some circumstances, did not apply. Second, Yoo argued that he was entitled to qualified immunity because the complaint failed to allege facts sufficient to establish his personal responsibility for the constitutional and statutory violations alleged in the complaint. Third, Yoo argued that he was entitled to qualified immunity because the complaint failed to allege a violation of clearly established constitutional or statutory rights.

The district court denied Yoo's motion. *See Padilla v. Yoo*, 633 F. Supp. 2d 1005 (N.D. Cal. 2009).[3] The court concluded that the plaintiffs could pursue a *Bivens* action, that the complaint adequately alleged Yoo's personal responsibility for Padilla's treatment and, as relevant here, that the complaint alleged violations of clearly established constitutional and statutory rights. *See id.* at 1030, 1032-34, 1036-39.

---

[3]The court granted Yoo's motion to dismiss in one respect, agreeing with Yoo that the complaint did not state a claim for violation of Padilla's Fifth Amendment right against self-incrimination because Padilla was never made to be a witness against himself and his statements were never admitted as testimony against him in a criminal case. *See Padilla*, 633 F. Supp. 2d at 1035-36. The plaintiffs did not appeal that ruling. In all respects relevant to this appeal, the court denied Yoo's motion.

With respect to this last issue, the district court acknowledged Yoo's argument that, at the time of Yoo's tenure at OLC, "no federal court ha[d] afforded an enemy combatant the kind of constitutional protections Padilla seeks in this case," and that "courts ha[d] never attributed the level of constitutional rights sought in this action" to enemy combatants — a "unique type of detainee." *Id.* at 1036. But the court concluded that the complaint nonetheless alleged violations of clearly established law because "the basic facts alleged in the complaint clearly violate the rights afforded to citizens held in the *prison context*," and because all detainees, including enemy combatants, must be afforded at least the rights to which convicted prisoners are entitled. *Id.* at 1036-38 (emphasis added). The court explained:

> [A]lthough the legal framework relating to the designation of a citizen as an enemy combatant was developing at the time of the conduct alleged in the complaint, federal officials were cognizant of the basic fundamental civil rights afforded to detainees under the United States Constitution. The Court finds that the complaint alleges conduct that would be unconstitutional if directed at any detainee, and therefore finds that the rights allegedly violated were clearly established at the time of the alleged conduct.

*Id.* at 1037-38 (citations and footnote omitted).

The court accordingly concluded that Yoo was not entitled to qualified immunity and denied Yoo's motion to dismiss. The crux of the district court's decision for purposes of this appeal is its assumption that any reasonable official would have understood in 2001-03 that *United States citizen enemy combatants in military detention must be afforded at least the constitutional and statutory rights afforded to ordinary prison inmates*.

## C.

Of relevance, a different federal district court reached a contrary result in a related case. In February 2007, Padilla and Lebron filed an action similar to this one in the United States District Court for the District of South Carolina against former Secretary of Defense Rumsfeld, former Attorney General Ashcroft, 11 other current or former government officials and unnamed Doe defendants, including the individuals allegedly responsible for Padilla's interrogation at the military brig. In February 2011, the district court dismissed the South Carolina case for failure to state a claim, in part concluding that the defendants were entitled to qualified immunity because the complaint failed to allege that Padilla's treatment violated clearly established law. *See Lebron v. Rumsfeld*, 764 F. Supp. 2d 787 (D.S.C. 2011).

First, the court rejected the proposition that Padilla's designation as an enemy combatant and consequential military detention violated his clearly established constitutional rights. *See id.* at 802-03. The court noted that President Bush had signed the order designating Padilla as an enemy combatant in June 2002, and that courts had reached inconsistent conclusions as to whether Padilla's designation and detention were lawful.[4] The court said:

---

[4]In 2002, the United States District Court for the Southern District of New York ruled on Padilla's first federal habeas petition, in which Padilla's counsel, despite having no contact with Padilla, challenged Padilla's designation and detention as an enemy combatant. *See Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002). The district court concluded that the post-September 11th Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), permitted American citizens to be detained without charge as enemy combatants, but that Padilla had a right both to counsel and to a judicial forum in which to challenge the factual basis of his detention. *See Padilla*, 233 F. Supp. 2d at 569-70. The Second Circuit reversed on the first point, holding that only a clear congressional statement could authorize the detention of an American citizen without charge. *See Padilla v. Rumsfeld*, 352 F.3d 695, 698 (2d Cir.

> In light of this quite extraordinary litigation history, the remarkable circumstances regarding the President's direct written order designating Padilla an enemy combatant, and the President's direction to subordinate officials to detain Padilla, it is hard for the Court to imagine a credible argument that the alleged unlawfulness of Padilla's designation as an enemy combatant and detention were "clearly established" at that time. The strikingly varying judicial decisions appear to be the very definition of unsettled law, and the Fourth Circuit's order, which is the law of the case, actually finds the detention and designation lawful.

*Id.*

---

2003). In June 2004, the Supreme Court reversed the Second Circuit on a jurisdictional ground, ruling that Padilla's habeas petition should have been filed in South Carolina, where he was detained, rather than New York, where he had been seized. *See Rumsfeld v. Padilla*, 542 U.S. 426, 451 (2004).

Padilla then filed his habeas petition in South Carolina. There, the U.S. District Court for the District of South Carolina granted the petition, ruling that Padilla's detention violated the Constitution and laws of the United States and that he therefore had to be either criminally charged or released. *See Padilla v. Hanft*, 389 F. Supp. 2d 678, 692 (D.S.C. 2005). The Fourth Circuit reversed, holding that the government could detain citizens without charge, even if seized within the United States, if they have carried arms against the U.S. in a foreign combat zone, as Padilla allegedly did. *See Padilla v. Hanft*, 423 F.3d 386, 389-92 (4th Cir. 2005). After Padilla petitioned for certiorari, and shortly before the government's response was due, the government transferred him to civilian custody and initiated criminal proceedings against him in the United States District Court for the Southern District of Florida, arguably mooting the petition. *See Padilla v. Hanft*, 432 F.3d 582, 584, 587 (4th Cir. 2005) (order) (denying government's request for transfer); *Hanft v. Padilla*, 546 U.S. 1084, 1084-85 (2006) (granting the request). The Supreme Court thereafter denied certiorari, without reaching the merits of Padilla's South Carolina habeas petition. *See Padilla v. Hanft*, 547 U.S. 1062 (2006).

Second, the court concluded that the manner in which Padilla was treated while detained as an enemy combatant, which included the alleged use of coercive interrogation techniques, likewise did not constitute a violation of clearly established constitutional law. *See id.* at 803-04. The court reasoned that:

> At the time of . . . Padilla's detention by the Department of Defense, there were few "bright lines" establishing controlling law on the rights of enemy combatants. No court had specifically and definitively addressed the rights of enemy combatants, and the Department of Justice had officially sanctioned the use of the techniques in question. While it is true there was vigorous intra-governmental debate on this issue during Padilla's detention, the qualified immunity case law makes clear that government officials are not charged with predicting the outcome of legal challenges or to resolve open questions of law.

*Id.* (citation omitted) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

Finally, the court concluded that Padilla's treatment while detained did not violate clearly established rights under RFRA. *See id.* at 804-05. The court pointed out that "[n]o American court during this period had ever definitively addressed the potential applicability of the RFRA to persons who were undergoing interrogation as enemy combatants." *Id.* at 804. The court accordingly held that the defendants were entitled to qualified immunity on the plaintiffs' RFRA claim as well. *See id.* at 805.

In January 2012, the Fourth Circuit affirmed dismissal of the South Carolina action. *See Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012). The court affirmed dismissal of the plaintiffs' constitutional claims for lack of a *Bivens* remedy. As relevant here, the court also affirmed dismissal of the plain-

tiffs' RFRA claims on the basis of qualified immunity, holding that RFRA's application "to the military detention setting" was not clearly established at the time of the alleged violations. *Id.* at 560. The court "emphasized the substantial differences between individuals in civilian custody and individuals in military custody." *Id.* at 558.

We asked the parties to file supplemental briefs addressing the Fourth Circuit's decision and, in particular, whether we should give preclusive effect to the Fourth Circuit's decision under the doctrine of nonmutual defensive collateral estoppel. The parties disagree about whether collateral estoppel should apply. In view of our precedent, we choose to treat the Fourth Circuit's decision as persuasive precedent rather than affording it preclusive effect. *See Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007). We nonetheless reach the same outcome as the Fourth Circuit, although based on somewhat different reasoning. Whereas the Fourth Circuit resolved the plaintiffs' constitutional claims under *Bivens* and relied on qualified immunity to resolve only the plaintiffs' RFRA claim, we resolve all claims under qualified immunity.

## D.

Yoo timely appealed the district court's order in this case denying his motion to dismiss. We have jurisdiction under 28 U.S.C. § 1291, *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1945-46 (2009), and we review de novo a district court's denial of a motion to dismiss on the basis of qualified immunity, *see Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010). "We accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "A complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state a claim to relief that is plausible on its face.'" *Coto Settlement v. Eisenberg*, 593 F.3d

1031, 1034 (9th Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1949).

## II.  DISCUSSION

### A.

The outcome of this appeal is governed by the Supreme Court's decision in *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), decided subsequent to the district court's ruling against Yoo. In *al-Kidd*, the plaintiff filed a *Bivens* action against then-Attorney General Ashcroft, alleging that Ashcroft violated al-Kidd's Fourth Amendment rights by authorizing federal prosecutors to obtain valid material witness warrants for detention of terrorism suspects whom they would otherwise lack probable cause to arrest. The complaint alleged that, "in the aftermath of the September 11th terrorist attacks, . . . Ashcroft authorized federal prosecutors and law enforcement officials to use the material-witness statute to detain individuals with suspected ties to terrorist organizations." *Id.* at 2079. It alleged "that federal officials had no intention of calling most of these individuals as witnesses, and that they were detained, at Ashcroft's direction, because federal officials suspected them of supporting terrorism but lacked sufficient evidence to charge them with a crime." *Id.* The complaint alleged that "this pretextual detention policy led to the material-witness arrest of [Abdullah] al-Kidd, a native-born United States citizen," leading al-Kidd to file a *Bivens* action challenging the constitutionality of Ashcroft's alleged policy as a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.* at 2079-80. Al-Kidd conceded that individualized suspicion supported issuance of the material witness arrest warrant, but argued that the arrest was unconstitutional because of Ashcroft's alleged subjective intent to use the material witness statute as a pretext to detain terrorism suspects who officials never intended to have testify. *See id.* at 2083. Ashcroft moved to dismiss based on absolute and qualified immunity. *See id.* at 2079.

The district court denied the motion and this court affirmed. *See id.* at 2079-80. The Supreme Court reversed.

**[1]** The Court began by reaffirming the general principle that "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 2080 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Significant here, under the second prong, a "Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Id.* at 2083 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* The Court emphasized that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," *id.* at 2085, and admonished us "not to define clearly established law at a high level of generality," *id.* at 2084.

Applying these principles, the Court concluded that al-Kidd's complaint fell "far short" of alleging a violation of clearly established law. *Id.* at 2083. The Court observed that, "[a]t the time of al-Kidd's arrest, not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional." *Id.* Furthermore, the Court's decisions as a whole had emphasized that Fourth Amendment reasonableness is "predominantly an objective inquiry," *id.* at 2080 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)) (internal quotation marks omitted), asking "whether 'the circumstances, viewed objectively, justify [the challenged] action,' " *id.* (alteration in original) (quoting *Scott v. United States*, 436

U.S. 128, 138 (1978)), " '*whatever* the subjective intent' motivating the relevant officials," *id.* (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). Although the Court had recognized certain "limited exception[s]" to this rule, *id.* at 2080 (alteration in original) (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001)) (internal quotation marks omitted), it had "almost uniformly rejected invitations to probe subjective intent," *id.* at 2081. The Court accordingly held that Ashcroft did not violate clearly established law by allegedly authorizing federal prosecutors to use material witness arrest warrants, supported objectively by reasonable suspicion, as a pretext for detaining terrorism suspects. *See id.* at 2085.

Here, the complaint alleged that Yoo, as a Justice Department attorney, participated in policy decisions and rendered legal opinions that ultimately authorized federal officials to designate Padilla as an enemy combatant, take him into military custody, hold him incommunicado without access to the courts or counsel and subject him to both coercive interrogation techniques and harsh conditions of confinement, in violation of his constitutional and statutory rights.

**[2]** Padilla and Lebron acknowledge that at the time Yoo served as Deputy Assistant Attorney General at OLC, there did not exist a "single judicial opinion," *id.* at 2083, holding that a United States citizen held in military detention as an enemy combatant possessed rights against the kind of treatment to which Padilla was subjected. They argue, however, that it was clearly established that Padilla possessed such rights because any reasonable official would have understood during 2001 to 2003 that a citizen detained as an enemy combatant had to be afforded at least the constitutional protections to which convicted prisoners and ordinary criminal suspects were entitled. That argument is foreclosed by *al-Kidd*, which compels us "not to define clearly established law at a high level of generality." *Id.* at 2084.

Granted, it may sometimes be permissible to rely on cases involving one type of detainee to establish clearly established constitutional rights of another type of detainee. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244-46 (1983) (holding that pretrial detainees possess a constitutional right against deliberate indifference to their serious medical needs because the due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner"); *Youngberg v. Romeo*, 457 U.S. 307, 315-16, 321-22 (1982) (holding that mentally retarded individuals who are involuntarily committed to a state institution have a constitutional right to reasonably safe conditions of confinement under the due process clause of the Fourteenth Amendment because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish"); *Hydrick v. Hunter*, 500 F.3d 978, 989 (9th Cir. 2007) (holding that "the rights afforded prisoners set a floor for those that must be afforded" sexually violent predators subject to civil detention), *vacated and remanded on other grounds*, 129 S. Ct. 2431 (2009); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) (holding, in light of the Supreme Court's "observation that the due process rights of pretrial detainees are 'at least as great as the Eighth Amendment protections available to a convicted prisoner,' " that the Eighth Amendment provides "a *minimum standard of care*" for determining the rights of pretrial detainees (quoting *Revere*, 463 U.S. at 244)). In *Hydrick*, for example, we held that court decisions defining the constitutional rights of prisoners could be relied upon to establish a floor for the clearly established constitutional rights of persons who are civilly detained as sexually violent predators, for whom the law was at that time "still evolving." 500 F.3d at 989. Central to our holding, however, was the Supreme Court's earlier statement that "civilly detained persons must be afforded 'more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.' " *Id.* (quoting *Youngberg*, 457 U.S. at 322).

**[3]** Here, of course, the Supreme Court had not, at the time of Yoo's tenure at OLC, declared that American citizens detained as enemy combatants had to be treated at least as well, or afforded at least the same constitutional and statutory protections, as convicted prisoners. On the contrary, the Supreme Court had suggested in *Ex parte Quirin*, 317 U.S. 1 (1942), the most germane precedent in existence at the time of Yoo's tenure at OLC, that a citizen detained as an unlawful combatant could be afforded *lesser* rights than ordinary prisoners or individuals in ordinary criminal proceedings.

In *Quirin*, the Court unanimously rejected the claim of a United States citizen who was detained as an unlawful enemy combatant that he was "entitled to be tried in the civil courts with the safeguards, including trial by jury, which the Fifth and Sixth Amendments guarantee to all persons charged in such courts with criminal offenses." *Id.* at 24. The petitioner in question — Herbert Haupt — was a German agent who claimed to be an American citizen. *See id.* at 20-22. He had entered the United States to commit acts of sabotage in support of the German war effort. *See id.* at 21-22. He was captured on American soil, charged by the Judge Advocate General's Department of the Army with violations of the law of war and the Articles of War and tried by a military commission. *See id.* at 21-23. He argued in a habeas corpus petition that he was entitled under Article III and the Fifth and Sixth Amendments to the Constitution to grand jury presentment and trial by jury. *See id.* at 38. The Court rejected his claim, reasoning that unlawful belligerents had been subject to military trial at the time of the Constitution's adoption and that neither Article III nor the Bill of Rights had been intended to alter that practice. *See id.* at 39-44. That Haupt was a citizen was immaterial; as an unlawful combatant he was subject to trial by military tribunal alongside the alien saboteurs with whom he was tried. *See id.* at 37-38, 44-45.

Padilla and Lebron alternatively rely on the Supreme Court's decision in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004),

to establish that Padilla's treatment violated clearly estab-
lished law. In *Hamdi*, the Court held that a citizen detained as
an enemy combatant retains a fundamental "right to be free
from involuntary confinement by his own government with-
out due process of law." *Id.* at 531 (plurality opinion). The
Court held that "a citizen-detainee seeking to challenge his
classification as an enemy combatant must receive notice of
the factual basis for his classification, and a fair opportunity
to rebut the Government's factual assertions before a neutral
decisionmaker." *Id.* at 533. The Court also held that a citizen-
detainee "unquestionably has the right to access to counsel in
connection" with those proceedings. *Id.* at 539. *Hamdi* also
intimated that detention of enemy combatants for an interrog-
ative purpose may be impermissible, noting that the proper
purpose of detaining enemy combatants "is to prevent cap-
tured individuals from returning to the field of battle and tak-
ing up arms once again," *id.* at 518 (citing Yasmin Naqvi,
*Doubtful Prisoner-of-War Status*, 84 Int'l Rev. Red Cross
571, 572 (2002)), and adding that "indefinite detention for the
purpose of interrogation" was not permitted by the act of Con-
gress authorizing the use of military force in Afghanistan, the
Authorization for Use of Military Force, Pub. L. No. 107-40,
115 Stat. 224 (2001), *id.* at 521; *see also id.* at 577-78 (Scalia,
J., dissenting) (suggesting that Congress would need to sus-
pend the Writ of Habeas Corpus before the government could
detain a United States citizen on American soil for the pur-
pose of "obtain[ing] intelligence through interrogation").[5]
*Hamdi* also called into question the harsh treatment of enemy
combatant detainees, suggesting that the detention of enemy
combatants should be "devoid of all penal character," *id.* at
518 (quoting W. Winthrop, *Military Law and Precedents* 788
(rev. 2d ed. 1920)) (internal quotation marks omitted), and

---

[5]*But see Hamdi*, 542 U.S. at 595 (Thomas, J., dissenting) (concluding
that the government has an interest in "detaining an enemy soldier not
only to prevent him from rejoining the ongoing fight" but also "to gather
critical intelligence regarding the intentions and capabilities of our adver-
saries").

that enemy combatants should be "treated humanely" while they are detained, *id.* at 519 (quoting *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946)) (internal quotation marks omitted).[6] When measured against this language in *Hamdi*, Padilla's alleged cruel and degrading treatment appears to have been a violation of his constitutional rights.

*Hamdi*, however, was not decided until 2004, so it could not have placed Yoo on clear notice of Padilla's constitutional rights in 2001-03 when Yoo was at the Department of Justice. Even after *Hamdi*, moreover, it remains murky whether an enemy combatant detainee may be subjected to conditions of confinement and methods of interrogation that would be unconstitutional if applied in the ordinary prison and criminal settings. Although *Hamdi* recognized that citizens detained as enemy combatants retain constitutional rights to due process, the Court suggested that those rights may not be coextensive with those enjoyed by other kinds of detainees. On the contrary, the Court held that the rights afforded to an enemy combatant detainee "may be tailored" to the circumstances, *id.* at 533, because "the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting," *id.* at 535.[7]

---

[6]In describing these standards, *Hamdi* made no express distinction between "[t]he capture and detention of *lawful* combatants and the capture, detention, and trial of *unlawful* combatants." *Hamdi*, 542 U.S. at 518 (emphasis added).

[7]This statement in *Hamdi* referred to detainees' *procedural* rights, not their *substantive* rights, and we do not read the statement as either suggesting or foreclosing the possibility that citizens detained as enemy combatants have lesser substantive constitutional rights than other types of detainees. *Cf. Vance v. Rumsfeld*, 653 F.3d 591, 610-11 (7th Cir. 2011) (observing that *Hamdi* addressed a question of procedural due process rather than substantive due process), *reh'g en banc granted and opinion vacated* (Oct. 28, 2011). We do observe, however, that the Supreme Court has in other contexts suggested the possibility that substantive rights too *may* vary according to the circumstances of the detention at issue. *See Youngberg*, 457 U.S. at 321-22 ("Persons who have been involuntarily

**[4]** In sum, the plaintiffs did not, through their reliance on either *Hamdi* or cases involving ordinary prison and criminal settings, allege violations of constitutional and statutory rights that were clearly established in 2001-03. During that relevant time frame, the constitutional rights of convicted prisoners and persons subject to *ordinary* criminal process were, in many respects, clearly established. But Padilla was not a convicted prisoner or criminal defendant; he was a suspected terrorist designated an enemy combatant and confined to military detention by order of the President. He was detained as such because, in the opinion of the President — albeit allegedly informed by his subordinates, including Yoo — Padilla presented a grave danger to national security and possessed valuable intelligence information that, if communicated to the United States, could have been helpful to the United States in staving off further terrorist attacks. We express no opinion as to whether those allegations were true, or whether, even if true, they justified the extreme conditions of confinement to which Padilla says he was subjected. *Cf. Rumsfeld v. Padilla*, 542 U.S. 426, 465 (2004) (Stevens, J., dissenting) (describing "[i]ncommunicado detention for months on end" as an "unlawful procedure[ ] to extract information"). In light of Padilla's status as a designated enemy combatant, however, we cannot agree with the plaintiffs that he was just another detainee — or that it would necessarily have been "apparent" to someone in Yoo's position that Padilla was entitled to the same constitutional protections as an ordinary convicted prisoner or accused criminal. *Anderson*, 483 U.S. at 640. Given the unique circumstances and purposes of Padilla's detention, and in light of *Quirin*, an official could have had some reason to believe that Padilla's harsh

committed are entitled to *more* considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." (emphasis added)). For our purposes it is sufficient to say that it was not *clearly established* in 2002 that United States citizens detained as enemy combatants possessed the same substantive due process rights as other types of detainees.

treatment fell within constitutional bounds.[8] Even after *Hamdi*, the degree to which citizens detained as enemy combatants must be afforded the constitutional protections granted other detainees remains unsettled, because "the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting." *Hamdi*, 542 U.S. at 535. The same is true of Padilla's RFRA claim. As the Fourth Circuit held, the application of RFRA to enemy combatants in military detention was not clearly established in 2001-03. *See Lebron*, 670 F.3d at 556-60.

**B.**

The absence of a decision defining the constitutional and statutory rights of citizens detained as enemy combatants need not be fatal to the plaintiffs' claims. The Supreme Court has long held that "officials can still be on notice that their con-

---

[8]Whereas convicted prisoners are detained for purposes of "retribution, deterrence, incapacitation, and rehabilitation," *Graham v. Florida*, 130 S. Ct. 2011, 2028 (2010), the President ordered Padilla detained to "prevent him from aiding al Qaeda in its efforts to attack the United States," and as a source of "intelligence about personnel and activities of al Qaeda[ ] that, if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda on the United States." Memorandum from President George W. Bush to the Secretary of Defense (June 9, 2002). In the absence of clear guidance from the courts, a reasonable official could have had some reason to believe that these circumstances justified affording an enemy combatant lesser constitutional and statutory protections than ordinary convicted prisoners. Some courts have been sympathetic to such rationales. *See Padilla v. Hanft*, 423 F.3d 386, 395 (4th Cir. 2005) (noting that military detention might be necessary to serve a governmental interest in restricting a detainee's "communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined"); *Lebron v. Rumsfeld*, 764 F. Supp. 2d 787, 805 (D.S.C. 2011) (observing that burdens on a detainee's religious observation might have served "the arguably compelling state interest in obtaining control over a critical subject during his interrogation . . . [or] the governmental interest in sustained interrogation over multiple hours to obtain the critical information sought").

duct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." (alteration in original) (quoting *United States v. Lanier*, 73 F.3d 1380, 1410 (6th Cir. 1996) (Daughtrey, J., dissenting)) (internal quotation marks omitted)).

**[5]** The plaintiffs invoke this principle here. They argue that, even if there is no specific judicial decision holding that the Fifth Amendment's prohibition on government conduct that "shocks the conscience" is violated when the government tortures a United States citizen designated as an enemy combatant, torture of a United States citizen is the kind of egregious constitutional violation for which a decision "directly on point" is not required. *Al-Kidd*, 131 S. Ct. at 2083.[9] We agree with the plaintiffs that the unconstitutionality of torturing a United States citizen was "beyond debate" by 2001. *Id.*[10]

(Text continued on page 4534)

---

[9]That substantive due process under the Fifth Amendment prohibits the government from engaging in conduct that "shocks the conscience" has long been clearly established. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (collecting cases). What has not been clearly established is how that standard applies to citizens detained as enemy combatants.

[10]As the State Department reported in February 2000:

6. *Torture is prohibited by law throughout the United States.* It is categorically denounced as a matter of policy and as a tool of state authority. Every act constituting torture under the Convention [against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment] constitutes a criminal offence under the law of the United States. *No official of the Government, federal, state or local, civilian or military, is authorized to commit or to instruct anyone else to commit torture.* Nor may any official condone or tolerate torture in any form. *No exceptional circumstances may be invoked as a justification of torture. United States*

*law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on grounds of exigent circumstances* (for example, during a "state of public emergency") or on orders from a superior officer or public authority, and the protective mechanisms of an independent judiciary are not subject to suspension. The United States is committed to the full and effective implementation of its obligations under the Convention throughout its territory. . . .

49. Torture has always been proscribed by the Eighth Amendment to the United States Constitution, which prohibits "cruel and unusual punishments". . . . *[T]he protections of the right to life and liberty, personal freedom and physical integrity found in the Fourth, Fifth and Eighth Amendments to the United States Constitution provide a nationwide standard of treatment beneath which no governmental entity may fall*. The constitutional nature of this protection means that it applies to the actions of officials throughout the United States at all levels of government; all individuals enjoy protection under the Constitution, regardless of nationality or citizenship. . .

112.   *Because the Eighth Amendment by its terms applies to "punishments", courts have looked to* other constitutional provisions, in particular the Fourth Amendment's protections against unreasonable searches and seizures and *the due process requirements of the Fifth and Fourteenth Amendments, to preclude the abuse or ill-treatment of individuals in other custodial circumstances. These constitutional protections are applicable and enforced at all levels of government.*

Initial Report of the United States of America to the United Nations Committee Against Torture ¶¶ 6, 49, 112, U.N. Doc. CAT/C/28/Add.5 (Feb. 9, 2000) (emphasis added), *available at* http://www.state.gov/documents/ organization/100296.pdf (an initial report of the United States' compliance with the Convention Against Torture); *see also Ali v. Rumsfeld*, 649 F.3d 762, 781-82 (D.C. Cir. 2011) (Edwards, J., dissenting in part) (cataloguing United States prohibitions on torture from the nineteenth century through the present day); *Arar v. Ashcroft*, 585 F.3d 559, 598 (2d Cir. 2009) (en banc) (Sack, J., dissenting) ("Although the 'shocks the conscience' test is undeniably 'vague,' '[n]o one doubts that under Supreme Court precedent, interrogation by torture' meets that test" (alteration in original) (citations omitted) (quoting *Harbury v. Deutch*, 233 F.3d 596, 602 (D.C. Cir. 2000),

Yoo is entitled to qualified immunity, however, because it was not clearly established in 2001-03 that the treatment to which Padilla says he was subjected amounted to torture.

**[6]** In 2001-03, there was general agreement that torture meant the intentional infliction of severe pain or suffering, whether physical or mental.[11] The meaning of "severe pain or

_____

*rev'd on other grounds sub nom Christopher v. Harbury*, 536 U.S. 403 (2002))); *cf. Vance*, 653 F.3d at 606 ("On what conceivable basis could a U.S. public official possibly conclude that it was constitutional to torture U.S. citizens?"), *reh'g en banc granted and opinion vacated* (Oct. 28, 2011).

[11]The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which the United States signed in 1988 and ratified in 1990, defines torture as:[A]ny act by which *severe pain or suffering, whether physical or mental, is intentionally inflicted* on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1(1), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (emphasis added). Similarly, the federal statute criminalizing torture that occurs abroad, 18 U.S.C. § 2340A, defines torture as "an act committed by a person acting under the color of law specifically intended to inflict *severe physical or mental pain or suffering* (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." *Id.* § 2340(1) (emphasis added). Section 2340 further defines "severe mental pain or suffering" as

> the prolonged mental harm caused by or resulting from — (A) the intentional infliction or threatened infliction of severe physical pain or suffering; (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the

suffering," however, was less clear in 2001-03. *See, e.g.*, Michael W. Lewis, *A Dark Descent into Reality: Making the Case for an Objective Definition of Torture*, 67 Wash. & Lee L. Rev. 77, 82-83 (2010); Judith Resnik, *Detention, the War on Terror, and the Federal Courts*, 110 Colum. L. Rev. 579, 633-34 (2010); Sanford Levinson, *In Quest of a "Common Conscience": Reflections on the Current Debate About Torture*, 1 J. Nat'l Security L. & Pol'y 231, 231-52 (2005).

In several influential judicial decisions in existence at the time of Yoo's tenure at OLC, for example, courts had declined to define certain severe interrogation techniques as torture:

*Ireland v. United Kingdom*, 25 Eur. Ct. H.R. (ser. A) (1978), is the European Court of Human Rights' leading decision on torture. The court considered whether five interrogation techniques used by the United Kingdom to interrogate suspected members of the Irish Republican Army violated Article 3 of the European Convention of Human Rights, which prohibits both torture and "inhuman or degrading treatment or punishment." The five techniques at issue were wall standing (i.e., stress positions), hooding, subjection to noise, sleep deprivation and deprivation of food and drink. *See id.* at 59.[12] Because the case was decided before ratification of the

---

senses or the personality; (C) the threat of imminent death; or (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

*Id.* § 2340(2) (emphasis added). The Torture Victim Protection Act (TVPA), Pub. L. No. 102-256, § 3(b), 106 Stat. 73 (1991), 28 U.S.C. § 1350 note, which provides a civil tort remedy for victims of torture, employs a similar definition of torture.

[12]The court described wall-standing as a "stress position" in which detainees were forced to stand spread-eagled against a wall with their feet

Convention Against Torture, the court turned to a definition provided by United Nations General Assembly Resolution 3452, which described torture as "an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." The court concluded that "[a]lthough the five techniques, as applied in combination, undoubtedly amounted to inhuman and degrading treatment," in violation of Article 3, "they did not occasion suffering of the particular intensity and cruelty implied by the word torture as so understood." *Id.* at 80.

In *HCJ 5100/94 Public Committee Against Torture in Israel v. Israel* 53(4) PD 817 [1999] (Isr.), *reprinted in* 38 I.L.M. 1471, the Israeli Supreme Court considered whether coercive techniques used by Israeli security forces violated international law. The techniques included hooding, violent shaking, painful stress positions, exposure to loud music and sleep deprivation.[13] The court concluded that each of these

---

back away from the wall, causing all of their weight to be borne by the fingers and toes. Hooding was the practice of keeping detainees' heads and faces covered by an opaque hood whenever they were not being interrogated. Subjection to noise involved keeping detainees in a room in which there was a continuous loud hissing noise. The court described deprivation of food and drink as keeping the detainees on a "reduced diet" during their stay at the interrogation centers (which lasted for several days but seldom exceeded one week).

[13]The court defined "shaking," considered the harshest of the challenged interrogation techniques, "as the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly." *Id.* at 1474. Evidence was submitted that "the shaking method is likely to cause serious brain damage, harm the spinal cord, cause the suspect to lose consciousness, vomit and urinate uncontrollably and suffer serious headaches." *Id.* The stress positions used, including the "Shabach" position and the "Frog Crouch," were alleged to cause "serious muscle pain in the arms, the neck and headaches." *Id.* at 1475. The court also considered allegations of excessively tight hand or leg cuffs, which allegedly "result[ ] in serious injuries to the suspect's hands, arms and feet." *Id.* Sleep deprivation was also alleged.

techniques was illegal, *see id.* at 1482-85, although the court did not address whether they constituted torture rather than cruel, inhuman and degrading treatment, which was also prohibited by international law.

In *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), the plaintiffs were two American citizens imprisoned in Libya, allegedly for political reasons. They alleged that they endured deplorable conditions while incarcerated, including urine-soaked mattresses, a cramped cell with substandard plumbing they were forced to share with seven other inmates, a lack of medical care and inadequate food. *See id.* at 86. They also alleged that they were "kicked, clubbed and beaten" by prison guards, and "interrogated and subjected to physical, mental and verbal abuse." *Id.* The plaintiffs sued Libya under the Foreign Sovereign Immunities Act, alleging torture. The court held that the plaintiffs had failed to adequately allege torture because they did not allege sufficiently *severe* pain or suffering, noting that "[t]he critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.* at 93. Although the plaintiffs alleged that they suffered "kicking, clubbing, and beatings," there was "no way to determine from the present complaint the severity of plaintiffs' alleged beatings — including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out." *Id.*[14]

---

Applicants "complained of being deprived of sleep as a result of being tied in the 'Shabach' position, being subjected to the playing of powerfully loud music, or intense non-stop interrogations without sufficient rest breaks. They claim that the purpose of depriving them of sleep is to cause them to break from exhaustion." *Id.* at 1476.

[14]The court, however, remanded to allow the plaintiffs to attempt to amend their complaint in an effort to satisfy the stringent definition of torture. *See Price*, 294 F.3d at 94.

In other decisions in existence at the time of Yoo's OLC tenure, this Circuit found torture, but the treatment at issue was more severe than that to which Padilla was allegedly subjected:

In *Al-Saher v. INS*, 268 F.3d 1143 (9th Cir. 2001), *amended on another ground*, 355 F.3d 1140 (9th Cir. 2004), an immigration case, we concluded that the petitioner was entitled to relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) because he had been tortured in Iraq. On one occasion, the petitioner was detained, interrogated and severely beaten for one month. *See id.* at 1145. During his interrogations, he was blindfolded and his hands were tied behind his back. *See id.* On another occasion, he was blindfolded, restrained, beaten and burned with cigarettes over an 8- to 10-day period. *See id.* Noting that these actions "were specifically intended by officials to inflict severe physical pain" on the petitioner, we held, under CAT, that he suffered torture. *Id.* at 1147-48.

In *Hilao v. Estate of Marcos*, 103 F.3d 789 (9th Cir. 1996), an Alien Tort Statute case, we held that two plaintiffs, Sison and Piopongco, were tortured in the Philippines during the regime of Ferdinand Marcos. *See id.* at 795. Sison had been interrogated by members of the military, who blindfolded and severely beat him while he was handcuffed and fettered; threatened him with electric shock and death; denied him sleep; and imprisoned him for seven months in a suffocatingly hot and unlit cell, measuring 2.5 meters square, during which time he was shackled to his cot, his handcuffs often so tight that the slightest movement made them cut into his flesh. *See id.* at 790-91. During this period, Sison felt "extreme" and "almost undescribable" pain. *Id.* at 791. After his seven months shackled to his cot, Sison spent more than eight years in detention, approximately five of them in solitary confinement and the rest in near-solitary confinement. *See id.* In one round of interrogation, lasting six hours, Sison's limbs were shackled to a cot, a towel was placed over his nose and mouth

and his interrogators then poured water down his nostrils so that he felt as though he were drowning. *See id.* at 790. The other plaintiff — Piopongco — was arrested, held incommunicado, interrogated, subjected to mock executions and threatened with death. *See id.* at 791.

Here, Padilla alleged that he was subjected to prolonged isolation; deprivation of light; exposure to prolonged periods of light and darkness, including being "periodically subjected to absolute light or darkness for periods in excess of twenty-four hours"; extreme variations in temperature; sleep adjustment; threats of severe physical abuse; death threats; administration of psychotropic drugs; shackling and manacling for hours at a time; use of "stress" positions; noxious fumes that caused pain to eyes and nose; loud noises; withholding of any mattress, pillow, sheet or blanket; forced grooming; suspensions of showers; removal of religious items; constant surveillance; incommunicado detention, including denial of all contact with family and legal counsel for a 21-month period; interference with religious observance; and denial of medical care for "serious and potentially life-threatening ailments, including chest pain and difficulty breathing, as well as for treatment of the chronic, extreme pain caused by being forced to endure stress positions." Compl. ¶¶ 55-56, 64, 69-71. The complaint also alleged, albeit in conclusory fashion, that Padilla "suffered and continues to suffer severe mental and physical harm as a result of the forty-four months of unlawful military detention and interrogation." Compl. ¶¶ 6, 76. It also alleged that Padilla suffered "severe physical pain" and "profound disruption of his senses and personality." Compl. ¶¶ 45, 75.

**[7]** We assume without deciding that Padilla's alleged treatment rose to the level of torture.[15] That it *was* torture was

(Text continued on page 4541)

---

[15]Recent decisions may offer support for this assumption. In *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011), four Afghan and five Iraqi citizens captured and held in Afghanistan and Iraq by the U.S. military sued

former Secretary of Defense Rumsfeld and three high-ranking Army officers, alleging the plaintiffs were tortured in violation of the Due Process Clause of the Fifth Amendment. *See id.* at 764-66. They alleged they were beaten, stripped naked, hooded, exposed to dangerously high temperatures, subjected to prolonged sleep deprivation, deprived of adequate food and water, subjected to mock executions and death threats, subjected to sensory deprivation, placed in restraints and stress positions, sexually assaulted and denied necessary medical care. *See id.* at 765-66. The majority did not address whether the plaintiffs' allegations rose to the level of torture. In a dissenting opinion, however, Judge Edwards, though observing that "[t]he definition of torture is a matter of some controversy," assumed without deciding "that the offenses articulated in the [plaintiffs'] complaint constituted torture" — in part because the government did not dispute the plaintiffs' assertion in its brief. *Id.* at 785 (Edwards, J., dissenting in part).

In *Vance v. Rumsfeld*, which the Seventh Circuit has vacated and agreed to rehear en banc, the plaintiffs were two United States citizens who alleged they were detained for weeks and illegally tortured by U.S. military personnel in Iraq in 2006. *See* 653 F.3d at 594. They alleged that the lights were kept on at all times in their cells; their cells were kept intolerably cold; guards would wake them if they were ever caught sleeping; heavy metal and country music was pumped into their cells at loud volumes; they were often deprived of food and water; they were repeatedly deprived of necessary medical care; they experienced "hooding"; they were "walled," i.e., slammed into walls while being led blindfolded with towels placed over their heads to interrogation sessions; they were threatened with excessive force and indefinite detention; their contact with their families was limited; one of the plaintiff's requests for clergy visits were denied; and they were forbidden to correspond with a lawyer or a court. *See id.* at 595-97. The three-judge panel held that any reasonable official in 2006 would have understood this treatment to amount to torture. *See id.* at 610. The government effectively conceded that the allegations amounted to torture. *See id.* at 607.

In a less comparable case, *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (en banc), a dual citizen of Syria and Canada challenged his extraordinary rendition to Syria. The plaintiff alleged violations of his substantive due process rights under the Fifth Amendment, in part based on his alleged detention and torture in Syria. The majority rejected the plaintiff's claim under *Bivens*, and thus did not decide whether the plaintiff's treatment in Syria amounted to torture or otherwise violated substantive due process.

not, however, "beyond debate" in 2001-03. There was at that time considerable debate, both in and out of government, over the definition of torture as applied to specific interrogation techniques. In light of that debate, as well as the judicial decisions discussed above, we cannot say that any reasonable official in 2001-03 would have known that the specific interrogation techniques allegedly employed against Padilla, however appalling, necessarily amounted to torture. Thus, although we hold that the unconstitutionality of torturing an American citizen was beyond debate in 2001-03, it was not clearly established at that time that the treatment Padilla alleges he was subjected to amounted to torture.

## C.

[8] For these reasons, we hold that Yoo is entitled to qualified immunity on the plaintiffs' claims.[16] Because we reverse

---

The dissent, however, deemed the plaintiff's treatment to be torture. The dissent described the most serious allegations as follows:

> During his first twelve days in Syrian detention, Arar was interrogated for eighteen hours per day and was physically and psychologically tortured. He was beaten on his palms, hips, and lower back with a two-inch-thick electric cable. His captors also used their fists to beat him on his stomach, his face, and the back of his neck. He was subjected to excruciating pain and pleaded with his captors to stop, but they would not. He was placed in a room where he could hear the screams of other detainees being tortured and was told that he, too, would be placed in a spine-breaking "chair," hung upside down in a "tire" for beatings, and subjected to electric shocks. To lessen his exposure to the torture, Arar falsely confessed, among other things, to having trained with terrorists in Afghanistan, even though he had never been to Afghanistan and had never been involved in terrorist activity.

*Id.* at 587 (Sack, J., dissenting).

[16]We have discretion to decide which of the two prongs of qualified immunity analysis to address first. *See al-Kidd*, 131 S. Ct. at 2080 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, we consider only the second prong.

on that basis, we do not address Yoo's alternative arguments that the complaint does not adequately allege his personal responsibility for Padilla's treatment and that a *Bivens* remedy is unavailable.

Our conclusion that Yoo is entitled to qualified immunity does not address the propriety of Yoo's performance of his duties at OLC otherwise. As amici point out, the complaint alleges that Yoo "*intentionally* violated professional standards reflected in OLC practice and *willfully* disregarded the obligations attendant on his office." Brief of Bruce Fein, Roberts B. Owen and Michael P. Scharf as *Amici Curiae* in Support of Plaintiffs-Appellees and Affirmance 2. Amici argue that "[s]uch conduct, if proven, would strike at the very heart of OLC's mission and seriously compromise the ability of the executive to make informed, even lawful, decisions." *Id.* at 2-3. These allegations have been the subject of an internal Department of Justice investigation of Yoo's compliance with professional standards and are not at issue here.[17]

### III.   CONCLUSION

Yoo is entitled to qualified immunity. The order of the district court denying Yoo's motion to dismiss is therefore reversed in pertinent part.

### REVERSED.

---

[17]The Department of Justice investigation produced two reports. *See* Dep't of Justice, Office of Prof'l Responsibility, Report of Investigation into the Office of Legal Counsel's Memoranda Concerning Issues Relating to the Central Intelligence Agency's Use of "Enhanced Interrogation Techniques" on Suspected Terrorists 260 (July 29, 2009) (concluding that Yoo committed "intentional professional misconduct"), *available at* http://judiciary.house.gov/hearings/pdf/OPRFinalReport090729.pdf; David Margolis, Memorandum of Decision Regarding the Objections to the Findings of Professional Misconduct in the Office of Professional Responsibility's Report 67, 68 (Jan. 5, 2010) (concluding that Yoo "exercised poor judgment" but did not "knowingly provide inaccurate legal advice"), *available at* http://judiciary.house.gov/hearings/pdf/DAGMargolisMemo100105.pdf.